HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SHAWN McDONALD,

    Plaintiff,

    v.

PIERCE COUNTY FIRE PROTECTION DISTRICT NO. 13, et al.,

    Defendants.

Case No. C04-5778 RBL

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.    Introduction.**

    This matter comes before the Court on the Defendants' Motion for Summary Judgment. [Dkt. #21]. Shawn McDonald (the "Plaintiff") brought a lawsuit against the Pierce County Fire Protection District No. 13, and each of its individual Commissioners, Jim Oberg, Richard Desimone, and Dick Collins (the "Defendants"), claiming damages and injunctive relief for violation of his First Amendment rights under 42 U.S.C. § 1983, as well as for wrongful discharge in violation of public policy, breach of contract, and wrongful withholding of wages. The Plaintiff has voluntarily dismissed the last claim.

    The Pierce County Fire Protection District No. 13 is a governmental entity which provides emergency services in the Browns Point/Dash Point community, and is the primary fire suppression agency for this area. This entity is governed by a board of commissioners, comprised of three citizens elected by

the people who manage the District's affairs. *See* RCW 52.14.010. The Commission has the power to enter into contracts, including employment agreements, in order to effectively operate as a governmental unit. *See* RCW 52.12.021. Its revenues are primarily derived from the power to tax and levy, and to issue bonds. The day-to-day operations of the District are overseen by a Chief, as well as a paid and volunteer command staff, along with a number of volunteer and resident firefighters and emergency medical technicians ("EMT's").

The Plaintiff first began volunteering for the District during high school, where he would assist with miscellaneous tasks, and attend training drills. Upon reaching the age of 18, the Plaintiff began working as a volunteer firefighter, and continued working for four to five additional years as a paid part-time engineer, maintaining the District's vehicles. In 1995, he became the part-time chief engineer and also assisted with various administrative duties. When the Plaintiff first began working for the District as a volunteer firefighter there were relatively few state requirements for training or certification. However, in the late 1990's the Department of Labor and Industries instituted new training guidelines and standards. The Plaintiff did not obtain certification under these new standards. Additionally, although not required, the Plaintiff was not certified as an EMT.

In 1999, the Plaintiff became Deputy Chief, and achieved the rank of Chief in 2002. His duties included controlling expenditures within the available budget; reducing costs; selecting, training, and evaluating personnel; and appointing special positions such as the Safety Officer and the Training Officer. During these years, the Plaintiff was evaluated annually. In these evaluations, he was described as competent, and professionally performing his responsibilities as Chief. Particularly, in his October 2002 and his November 2003 performance reviews he excelled in each area of review.

The terms and conditions of the Plaintiff's employment were governed by a personal services contract that he drafted after reviewing sample contracts provided by the District's attorney, Joseph Quinn. The contract provided for two avenues of termination for the Plaintiff: "for cause," and "without cause." In the "without cause" section of the contract, there were five non-exclusive enumerated provisions by which the Defendant employer could terminate the Plaintiff's employment - downsizing, reorganization, layoff, annexation, contracting to another district or department, etc. Termination upon such grounds would require the Defendant to pay the Plaintiff six month's salary as severance pay, along with accrued

vacation, holidays, and compensatory time.

The District's primary revenue source is its bi-annual property tax collections in April and October. In 2001, Initiative 747 passed and set a 1% cap on the amount that tax levies could be increased each year. As a result, the District's expenses rose significantly and it suffered twice-yearly deficits before new infusions of tax revenue. Beginning in 2001, the District began a four-year downward financial spiral that, according to the Defendants, did not reverse itself until the new Chief was appointed.

On May 14, 2003, the Plaintiff wrote a letter to the Defendants notifying them that he was experiencing difficulty maintaining sufficient numbers of volunteer firefighting staff. In this letter, he recommended offering an educational benefit program in order to attract prospective volunteers, or to begin paying resident firefighters to cover shifts. The Plaintiff also suggested increasing the salary allotted to the Training and Safety Officers. And his long-term solution was to hire two full-time firefighters to work weekdays, and have them serve as Training and Safety Officers. He then noted that if funding was not available to pay for these positions, the District should explore contracting with the Tacoma Fire Department.

The Commission considered these recommendations, and determined to pursue two major courses of action: increasing the number of volunteers, or contracting with another department. Additionally, at board meetings held in August, 2003, the Commissioners discussed placing a "lid lift" on the November 2003 ballot to ask voters to approve an increase in their property taxes above the annual 1% growth limit. However, the Commissioners ultimately decided against this action because their most recent levy vote had been resoundingly defeated. The Commissioners engaged in negotiations with the Tacoma Fire Department to provide services to supplement their own, but in January, 2004 the Tacoma City Council ended the discussions and declined to enter into any agreement with the District.

On March 1, 2004, Commissioner Oberg and the Plaintiff met with Dave Crossen, a strategic planning consultant, to discuss the possibility of entering into a consulting agreement with him. Commissioners Desimone and Collins also joined the meeting. The Plaintiff expressed his concern that the presence of all three commissioners conducting District business would violate the Open Public Meetings Act. *See* RCW 42.30. The Commissioners agreed that they should not participate in the discussion, but expressed their opinion that it would be appropriate for them to stay and listen. The Plaintiff alleges that

they did, in fact, participate in the meeting, although the Commissioners maintain that they did not. After the meeting, the Plaintiff contacted the District's attorney, Joseph Quinn, to describe the events and seek his advice. Quinn advised the Plaintiff that he should have the District secretary draft minutes for the Commissioners to sign, in order to cover for any possible violations of the Open Public Meetings Act. The Plaintiff followed Quinn's advice and the Commissioners signed the minutes of a "special meeting." Approximately one week later, at its regular board meeting, the Commissioners restricted the Plaintiff's authority to contact legal counsel by requiring him to first get approval by the full board in non-emergency situations, and by at least one board member in emergency situations.

On April 15, 2004, the Plaintiff wrote to the Commissioners to inform them that his Training Officer had resigned and that he did not have anyone on staff qualified to serve in that capacity. The Plaintiff also expressed concern about the low numbers of volunteers, as well as the lack of a Safety Officer. He also noted that the District was understaffed and was not in compliance with the applicable safety standards, and that, as a result, he could no longer be held responsible for the District's operations.

In an effort to address the District's escalating budget problems, Commissioner Desimone considered utilizing a part-time Chief as a way to reduce overhead expenses and increase the effectiveness of the person in that role. Thus, on April 20, 2004, Commissioner Desimone met with Quinn to review the Plaintiff's employment contract and discuss the reorganization of the District. Finally, on April 26, 2004, the Commissioners and Quinn held an executive session at a special board meeting and discussed whether changes to the Chief position might help improve the budget. After concluding their discussion, they invited the Plaintiff in to explain that a motion would be made to invoke Section 5 of his contract, terminating him "without cause" due to the District's reorganization. The motion was carried by a unanimous vote.

Upon the Plaintiff's termination, the District actively began searching for a new part-time Interim Fire Chief, and at a board meeting on April 29, 2004, the Commissioners interviewed and hired Gary McVay for this role. The Defendants note that McVay was a highly qualified candidate, having worked as both a volunteer and resident firefighter in the neighboring districts, as well as an EMT and emergency supervisor for most of his professional career. McVay was initially hired on a part-time basis under a six month contract, and was paid $2,000 per month, with $1,000 per month deferred until the end of the six-

1  month interim period, and was provided with no benefits.  One of McVay's first tasks was to find a new
2  Safety Officer, for which Kevin Hucke was eventually appointed.  Hucke was already a firefighter in the
3  District and possessed the necessary qualifications to serve as the Safety Officer.  McVay also recruited
4  additional firefighters, and the number increased from five at the time of his hiring to approximately 30 at
5  present.  McVay also assumed the task of the District's secretary and Training Officer.  At the end of this
6  interim period, McVay was offered a full-time position where he would serve as both the administrative
7  and operations chief, maintaining his EMT certification, and obtaining recertification as a firefighter.

8  **II.   Discussion**.

9      **A.   Summary Judgment Standard**.

10      Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-
11  moving party, there is no genuine issue of material fact which would preclude summary judgment as a
12  matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the
13  non-moving party fails to present "specific facts showing that there is a genuine issue for trial." *Celotex*
14  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of
15  the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216,
16  1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are
17  irrelevant to the consideration of a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477
18  U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the non-moving party
19  fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton*
20  *Energy*, 68 F.3d at 1220.

21      **B.   The Plaintiff's First Amendment Rights.**

22      The first and principal question presented by this action is whether the District's termination of the
23  Plaintiff violated his First Amendment right of Freedom of Speech.  The Civil Rights Act of 1871 provides
24  the avenue by which a plaintiff may assert a claim for damages against any person who, under color of law,
25  subjects any citizen of the United States to the deprivation of any rights, privileges, or immunities secured
26  by the Constitution and laws.  42 U.S.C. § 1983.  When evaluating a First Amendment claim against the
27  government for unlawful retaliation the Court must apply the three-part test articulated in *Coszalter v. City*
28  *of Salem*, 320 F.3d 968 (9th Cir. 2003).  That is, an employee must show (i) that he or she engaged in

protected speech, (ii) that the employer took adverse employment action, and (iii) that his or her speech was a substantial or motivating factor for the adverse employment action. *Id*. at 973. Upon such a showing, "the burden shifts to the public employer to demonstrate either that, under the balancing test established by *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), its legitimate administrative interests outweighed [the Plaintiff's] First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977), it would have reached the same decision even in the absence of the Plaintiff's protected conduct." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002).

Generally, the first element of the *Coszalter* three-part test requires that the speech address "a matter of legitimate public concern." *Coszalter*, 320 F.3d at 973. This determination is made by paying special attention to the "content, form, and context of the speech." *Id*. If the public employee's speech cannot be so characterized, the First Amendment is inapplicable and the court need not make any further inquiry into the government action. *Id*. Here, the Plaintiff's speech is clearly protected. Indeed, the Plaintiff's letters to the Commission addressed his concerns that the District was not maintaining sufficient numbers of volunteer firefighters, as well as his concerns over the loss of a Training and Safety Officer, and his suggestions for the actions that the Commissioners might take in order to resolve these problems. This speech unquestionably concerns "issues about which information is needed to enable the members of society to make informed decisions about the operation of their government," and, therefore, "falls squarely within the boundaries of public concern." *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001).

The second element requires the Plaintiff to demonstrate that he "suffered a loss of any governmental benefit or privilege in retaliation for protected speech activity, not that he had a legal right to the benefit denied him." *Ulrich*, 308 F.3d at 977 (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1134-35 (9th Cir. 1992)). Here, the Plaintiff served as the District's Fire Chief since 2002, and his termination on April 26, 2004 constituted an adverse employment action. Thus, the second element of this three-part test is also satisfied.

The third and, for purposes of this case, the most important element of the *Coszalter* test is satisfied by a showing that at least one of three distinct scenarios exists. First, a plaintiff may create a genuine issue of material fact if "he produce[s] . . . evidence that 'the proximity in time between the protected action and

ORDER
Page - 6

the allegedly retaliatory employment decision' was one in which a 'jury logically could infer [that the plaintiff] was terminated in retaliation for his speech.'" *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751 (9th Cir. 2001) (quoting *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1998)). Second, a plaintiff may introduce evidence that his employer expressed opposition to his speech, either to him or to others. *Id.* Finally, a plaintiff may produce evidence that his employer's proffered explanations for the adverse employment action were false and pretextual. *Id.*

The Plaintiff points to several items of evidence to support his contention that his speech was a substantial or motivating factor in his termination, each are discussed in turn: the timing of his termination, his history of positive performance evaluations, the fact that the Commissioners did not ask him to reduce his hours or salary or to be a part of their reorganization plans, and his claim that he was replaced by a person with fewer qualifications who was being paid a higher salary.

**1.      The Timing of the Plaintiff's Termination**.

The Plaintiff argues that as a result of his opposition to the participation of Commissioners Desimone and Collins in the March 1, 2004 meeting, along with his ongoing criticism of the compliance of the District with applicable safety standards, his employment was terminated under the pretext of "reorganization." In a handful of recent cases, the Ninth Circuit has held that time periods between three and eleven months are easily within the range to support an inference that an employment decision was retaliatory. *Coszalter*, 320 F.3d at 977; *see also Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002). Moreover, the *Coszalter* court found that "a specified time period cannot be a mechanically applied criterion . . . [w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Coszalter*, 320 F.3d at 978.

The Plaintiff's assessments here began with a letter sent to the Commissioners in May 2003, and ended with his latest letter of April 15, 2004. There is evidence that indicates that during this time period the Defendants became increasingly frustrated with the Plaintiff's suggestions and criticisms of how the District might handle its financial and staffing needs. In fact, Commissioner Collins stated in his Deposition that the Plaintiff "created or identified problems that we had [and] [r]arely was there a solution for these problems." *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 19 [Dkt. #30].

ORDER
Page - 7

And when the Plaintiff began to criticize the board's compliance with the Open Public Meetings Act, the Defendants restricted the Plaintiff's authority to make any further contact with the District's legal counsel, and terminated his employment several weeks later. This time frame certainly falls within the proximity prescribed by the Ninth Circuit in *Coszalter*.

This is much the same scenario as the court was faced with in *Allen v. Iranon*. There, the Plaintiff had worked in his current position for several years, and was involved in numerous disputes, and after he began to criticize the current prison administration he was subject to disciplinary action. Ultimately, the court held that although the protected statement was made eleven months prior to the disciplinary action, this time frame supports an inference that the employment decision was retaliatory. Similarly, here the Plaintiff had been involved in a series of ongoing criticisms of the District from May 2003 until April 2004. Soon after he began to criticize the Commissioners compliance with the Open Public Meetings Act his employment was terminated. The protected statements occurred eleven months prior to the termination, at the earliest, and two weeks prior, at the latest. Consequently, the proximity in time between the protected speech and the retaliatory employment decision could create a logical inference in the mind of the jury that the employment decision was retaliatory.

### 2. The Plaintiff's History of Positive Performance Evaluations, and the Defendants' Failure to Include Him in Their Reorganization Plans are Evidence that the Defendants' Explanations May Be Pretextual.

The District's actions here are also vulnerable under the "pretextual" prong illustrated in *Keyser*. The Supreme Court, in decisions such as *Burdine*, has substantially narrowed the scope of this inquiry. In that case, the Court held that "a plaintiff may establish pretext (i) either directly by persuading the court that a discriminatory reason more likely motivated the employer, or (ii) indirectly by showing that the employer's proffered explanation is unworthy of credence." *Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). As part of the Plaintiff's role as Chief he was evaluated on an annual basis. In each of these evaluations he was described as competent, and professionally performing his responsibilities as Chief. Particularly, in his October 2002 and his November 2003 performance reviews he excelled in each area of review. *See* Declaration of Shawn McDonald, p.2, ¶ 5 [Dkt. #31]. Yet part of the Defendants' reason for terminating

the Plaintiff was "to increase the effectiveness of the person in that role in managing the most difficult and pressing concerns, staffing and funding." *See* Defendants' Motion for Summary Judgment, p. 8 [Dkt. #21]. This evidence, coupled with the Defendants' admission that the Plaintiff was "pointing the finger at the Commissioners instead of trying to work creatively to reduce expenses," could lead to the inconsistent but logical conclusion that a discriminatory reason more likely than not motivated the Defendants here. *Id*. at 4.

Further, when considering the possibility of "reorganizing" by using a part-time Chief, as opposed to the full-time position that the Plaintiff formerly occupied, the Defendants made no effort to contact the Plaintiff in order to see if he would be receptive to such a role. Moreover, the duties that the new Interim Fire Chief was to assume were virtually identical to those that the Plaintiff was already performing. *See* Declaration of James Oberg, Ex. C [Dkt. 23], *see also* Declaration of Jon Rosen, Ex. 7 [Dkt. #34]. This pattern of behavior may suggest an intent to terminate the Plaintiff's employment based upon the content of his protected speech.

### 3.    The Plaintiff's Replacement Was Well-Qualified.

As part of his claim that his speech was a substantial or motivating factor in his termination, the Plaintiff asserts that he was replaced by a less qualified candidate. The Plaintiff's background does vary on some minor points, but is nevertheless substantially similar to that of his replacement, Gary McVay. Indeed, both worked after high school as volunteer firefighters, both have similar training and education, and both have supervisory experience. The Plaintiff does have significant experience as a firefighter as he has worked in this position since 1982, and McVay's qualifications indicate much less actual firefighting experience. However, McVay has worked as an EMT and emergency supervisor for most of his professional career, and the Plaintiff never received certification as a firefighter, nor was he certified as an EMT. Thus, the Court cannot determine as a matter of law that the Plaintiff's replacement was not qualified for the role of Chief, as McVay's credentials appear to differ in form, rather than in substance. Yet this point is ultimately irrelevant to the Plaintiff's success in this motion as he has created a genuine issue of material fact by producing evidence from which a jury could conclude that the Defendants' explanations for the adverse employment action were false and pretextual, and the proximity in time between the protected speech and the Plaintiff's termination was one which creates an inference that the

employment decision was retaliatory.

### 4. The Defendants May Not Be Able to Rebut the Plaintiff's Showing of Retaliatory Termination.

Once the Plaintiff has set forth facts sufficient to make a showing that the government has engaged in unlawful retaliation, the burden then shifts to the Defendant to demonstrate that it would have reached the same decision even in the absence of the Plaintiff's protected conduct. *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002). The Defendants maintain that they would have taken steps to reorganize in an effort to reduce the budget deficit even in the absence of the Plaintiff's criticism. *See* Defendants' Motion for Summary Judgment, p. 18 [Dkt. #21]. This assertion may in fact be true as it reflects the District's efforts to resolve the financial difficulties that it was experiencing from 2001 until approximately June 2004.

At the same time, however, the District's reorganization may not have included the Plaintiff's termination in the absence of his constitutionally protected speech. The following three items of evidence support this contention. First, when McVay was hired as the new Fire Chief in April 2004 he was charged with the same responsibilities as the Plaintiff formerly had as Chief. If the Defendants had been intent on reorganizing so as to reduce unnecessary expenditures, one might assume that the new position - at the time McVay was hired - would have encompassed substantially more duties and responsibilities than the Plaintiff's position called for.

Second, although McVay was hired on a part-time interim basis for a salary of $2,000 per month, with $1,000 per month deferred until the end of the six-month interim period, the District - under the terms of the Plaintiff's employment contract - was paying the Plaintiff's severance of $4,713 per month for six months. Consequently, the District's expenditures actually increased as a result of the Plaintiff's termination. Third, if the Defendants were seeking a qualified candidate to fill the position of Fire Chief then it seems plausible that they would have at least approached the Plaintiff with the prospective opportunity, given his tenure in the District, along with his history of positive performance evaluations. The Plaintiff was not given the chance to compete here. Thus, the nexus between the Defendants' proffered excuse of reorganization and the Plaintiff's termination seems somewhat tenuous.

### C. The Plaintiff's Claim that His Termination Violated Public Policy.

The Plaintiff's second claim is for wrongful discharge in violation of public policy. In the 1996 case of *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941 (1996) the court further refined the common law test for public policy wrongful discharge torts. In this case, the court proposed four elements to analyze such claims: (i) the plaintiff must prove the existence of a clear public policy (the *clarity* element); (ii) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy (the *jeopardy* element); (iii) that the public-policy-linked conduct caused the dismissal (the *causation* element); and (iv) the defendant must not be able to offer an overriding justification for the dismissal (the *absence of justification* element).

Whether a particular statute contains a clear mandate of public policy is a question of law. *Hubbard v. Spokane County*, 146 Wn.2d 699, 708 (2002). The Plaintiff points to two separate Washington state public policies to support the clarity element. The first is the Washington Industrial Safety and Health Act ("WISHA"), RCW 49.17.010, which declares the legislature's intent to "create, maintain, continue, and enhance the industrial safety and health program of the State of Washington," along with RCW 52.02.020, which authorizes fire protection districts to provide services for the protection of the community's lives and property. The second public policy is the Open Public Meetings Act, RCW 42.30.010, which requires public boards to deliberate and take actions openly. In accordance with the court in *Smith v. State Employment Sec. Dept.*, 100 Wn. App. 561, 569 (2000), this Court finds that WISHA shows a legislative intent to set forth a clear mandate of public policy. Moreover, this Court also finds that the Open Public Meetings Act constitutes such a mandate.

The second element requires the plaintiff to show that (i) he engaged in particular conduct, (ii) the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy, and (iii) how the threat of dismissal will discourage others from engaging in the desirable conduct. *Gardner*, 128 Wn.2d at 945. "This burden requires a plaintiff to argue that other means for promoting the policy . . . are inadequate." *Id*. The Plaintiff's letters to the Defendants stating his concerns about the staffing level of the District, as well as the Commissioners' compliance with the Open Public Meetings Act, directly relate to WISHA, RCW 52.02.020, and the Open Public Meetings Act. Indeed, the Plaintiff's opinion as to the low number of volunteer firefighters necessarily involves the District's adherence to public policies regarding workplace and community safety standards. Moreover, the Plaintiff's criticism of

ORDER
Page - 11

the Commissioners' possible violation of the Open Public Meetings Act directly relates to this public policy. The Plaintiff's termination here alerts others as to the consequences of bringing attention to any possible violations by the District of community safety, workplace safety, or general compliance standards. Plainly, other means of conduct or comment are not acceptable substitutes here.

The third element requires the Plaintiff establish that the public-policy-linked conduct caused the dismissal. Here, the Plaintiff had been criticizing the District's handling of its financial and staffing affairs for nearly a year, once he commented about the Commissioners' compliance with the Open Public Meetings Act his employment was terminated within several weeks. It is possible that a jury could find that the public-policy-linked conduct caused the Plaintiff's dismissal.

The Defendants attempt to justify the dismissal under the fourth element, by providing an overriding justification. Specifically, the Defendants argue that the Commissioners were concerned about the future safety of the community, the adequacy of volunteer staffing, and the District's continued financial solvency, and the Plaintiff's termination was therefore warranted under these circumstances. *See* Defendants' Motion for Summary Judgment, p. 22 [Dkt. #21]. The Defendants further note that they believed the Plaintiff could have done a better job in managing the budget. *Id*. at 23. This reasoning for the Plaintiff's termination constitutes "for cause" under Section 5 of the Plaintiff's employment agreement. Furthermore, this justification contradicts the Defendants' earlier explanation of reorganization. Under Section 5 of the Plaintiff's employment contract, the Defendants would have had to follow four separate requirements in order to properly terminate the Plaintiff "for cause." None of these provisions were followed as the Defendants have previously asserted that the Plaintiff was dismissed "without cause" and for "reorganization." These inconsistent explanations for the Plaintiff's termination create a disputed issue of material fact that the Defendants' motive here was neither reorganization nor poor job performance. The Defendants cannot, therefore, satisfy the fourth element as a matter of law.

**D.     The Defendants Are Not Entitled to Summary Judgment on the Plaintiff's Breach of Contract Claim.**

The Plaintiff's final claim is for breach of contract.  For the reasons given above, factual issues prevent the Court from concluding as a matter of law that defendant Pierce County Fire Protection District No. 13 did not breach its contract with plaintiff.

The Defendants' Motion for Summary Judgment is hereby DENIED.  [Dkt. #21].

IT IS SO ORDERED.

DATED this 30th day of January, 2006.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE